ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY *v.* OLESON.

Opinion delivered January 14, 1907.

1. RAILROADS—DUTY TO PROVIDE FOR SAFETY AND COMFORT OF PASSENGERS.—It is the duty of railroads, as common carriers of passengers, to provide their stations and cars with reasonable appointments for the safety and essential comfort of their passengers. (Page 411.)

2. SAME—INGRESS AND EGRESS INTO AND FROM COACH.—Where a train was delayed for several hours in a city, it was not negligence for the railroad company to lift the trap door and open the upright door to. a vestibuled coach, as the passengers would otherwise be deprived of ingress and egress into and from the coach. (Page 411.)

Appeal from Washington Circuit Court; *J. S. Maples,* Judge; reversed.

### STATEMENT BY THE COURT.

The complaint alleges that plaintiff was a passenger on defendant's train between Brentwood, Arkansas, and Kansas City,

Missouri. That he was transported to Fort Scott, Kansas, at which point he arrived at about 3 o'clock in the morning of the 12th of July. That defendant disconnected the said car in which the plaintiff was being transported as a passenger from its regular train, and placed it upon a side track at Fort Scott, Kansas, where said car remained for about one or two hours. That, after the said car was so placed upon the said sidetrack, the plaintiff remained in the seat provided for him by the said defendant for about one or two hours until it became and was necessary for the plaintiff to go forward to the front end of the said car. That at the time it became and was necessary for the plaintiff to go to the front end of the said car, as aforesaid, the night was dark, and there were no lights near the said car, either upon or near the said track, by which a person could learn or ascertain the condition surrounding the said front platform. That plaintiff, without fault or negligence on his part, proceeded along the aisle of said car to the front platform, and after reaching said platform, on account of the fault and negligence of defendant railroad company in not causing to be kept down in its place the trap door over the steps leading into the said car and in not keeping closed the upright door for the entrance from the ground into said car by means of steps attached thereto and in keeping said trap door open and said upright door open, and in failing to provide lights on or about the front platform of said car and steps, without fault or negligence on his part, fell from said platform down said steps onto the ground, breaking his shoulder, his arm, and his ribs, and injuring him internally about the breast, back and sides and sustained permanent and lasting injuries.

The first paragraph of the answer contained a general demurrer; the second denied each allegation of the complaint; the third set up contributory negligence; and the fourth assumed risk.

The evidence showed that the appellee was a native of Denmark, and unable to speak English, was eighty-one and a half years old, was a passenger on the defendant's train, intending to

go from Brentwood, Ark., to Milwaukee, Wis., via Kansas City, Mo. That he changed cars once with the help of the conductor between Brentwood and Fort Scott, and that, after his train reached Fort Scott, the car he was in was detached from the train and switched to the sidetrack. That, after remaining on the side-track, the plaintiff, who was old and feeble, was compelled to answer a call of nature and got up from his seat and went forward to a point where he supposed a water-closet to be. When he got to this point, he found the door locked, and, thinking per-haps he was at the wrong door, and having a short time before seen some employee of the defendant lock a door near that end of the car and then go out of the door at the end of the car, and thinking that he would either find a closet or the man whom he had seen lock the door by going forward, walked out into the vestibule, and, the trap door over the steps being up and the upright door being open, he fell and received the injuries complained of.

The proof shows that he was an inexperienced traveler, not well enough acquainted with the different kinds of railway cars to tell what kind of a car he got in at Monett.

The exact language of appellee as to how he fell is as fol-lows: "After I failed to get into the water closet, I went to the door, but I could not describe the room out there because it was dark, and that, of course, was when I fell off. Did not see any other door outside. When I went to the car door, it was dark; I could not see any door."

Henry Bassett, porter of the train, testified that there was no provision for lighting the vestibule except with an electric light, and that the electric light in the roof of the vestibule is on the same circuit as the electric light in the roof of the inside of the car, and that the lights in the upper deck, both inside the car proper and in the vestibule, can not be turned down so as to shine dimly, but must either be turned off entirely or left shin-ing with full force; and also that any attempt to turn out any one light in the upper deck inevitably results in turning out all the lights in the upper deck, both inside the car and in the vestibule.

He also testifies that there were lights on the sides of the car, which could be turned on or off without any reference to the lights in the upper deck, and that these lights on the sides were so arranged that a part of the lights on the side could be turned off and part left shining. The car was equipped with electric lights, Pintsch gas and coal oil lamps. On the night of appellee's injury the lights in the upper deck were burning. The lights in the lower deck were turned out. Only one kind of light was used at a time. The electric light was the best; if that gave out, they used gas; and if, for any reason, the electric and gas light failed, they used coal oil lights which are set around on the sides and ends of the cars. Several witnesses for appellant, including the conductor, testified that the electric lights were burning in the upper deck, and that the vestibule was lighted with the electric light and well lighted, while one or two witnesses for appellant testified that the lights were dim in the vestibule.

All the witnesses for appellant establish the fact' that the light on the platform was good, and their testimony tends to prove that, from the lights that were on the platform and other places, it would be perfectly safe for passengers to go on and off the car where this car was located, even if the lights on the car had not been burning. It was shown that the car was at the passenger depot opposite the baggage room at the passenger platform.

There was proof on behalf of appellant to the effect that the coach remained at Fort Scott about 20 or 30 minutes. The proof was that the car was unattended, after being left on the track, by any of the company's employees. It was the uniform custom in cities the size of Fort Scott to lock the water closets on the cars at the stations. It was shown that the platforms of the vestibule coaches were raised to enable the brakemen to discharge their duties. This was customary in cities like Fort Scott.

Ola Larsen, who was called to Fort Scott by telegram after the injury of his father, testified in part as follows: "I took the

four o'clock train. Got to Monett about eight or nine o'clock. Remained there until eleven o'clock or a few minutes after. I changed cars at Monett, and when I changed again the train pulled right up by another train, and we stepped right off one train onto the other. It was at Pittsburg that I changed the second time, where the train pulled right up by the side of the train I was on. They were Frisco trains. I got into Fort Scott fifteen minutes after three in the morning. The train that arrives at Fort Scott at that time is the same train my father arrived on. Arrived at the same time, regular train. The car I was in was a vestibule car."

Over the objection of appellant he was permitted to continue his testimony as follows:

"When the car I was riding in got to Fort Scott, the train that it was attached to came in on the third track. There were two tracks between our track and the depot. The track in front next to the depot is the one the train comes in on that goes on. I never had been in Fort Scott before. Never had been off the train there before, and this was in the night, and it was very dark. The moon went down just as we left Pittsburg. When the train stopped, I was very anxious to get there, very anxious to get to my father, and I had not slept any during the night. The train stopped on the third track, as near as I can tell. The front end of the car was right half way between the depot and the telegraph office."

Q. "Was the car that you were on switched upon this track, or just run in there, the train run in there on that track, or was the car disconnected and switched upon this track?" A. "I did not feel any switching. We run right in on that track. I did not feel any switching. I found when I got off the car there—some railroad men gave me the information—where I would find my father. I saw a whole lot of yard men with lanterns. I had started off towards the telegraph office, where they had telegraphed me, to see if I could get any information where I could find my father, and find out whether he was all right or not now, and met these railroad men, and they told me where I could find him, and that he was all right." Q. "You got off the car at that point. Now, where did you go? A. "I

was there in the night yardmaster's office for a while. I went then and got some breakfast. I had not eaten anything since I left home, and then I went out and inquired the way to the hospital, and found that it was two miles away, but that the street cars run right by there, and in the meantime I was out around the yards a good deal before I started away." Q. "Now, you were back in that car again after you went out of it—went back in there with the night yardmaster." A. "Yes, sir, me and the night yardmaster were there a half hour; all of a half hour." Q. "Now, on the front of the coach, was that well lighted?" A. "No, sir. The yardmaster had his lantern there." Q. "Was that a vestibule car?" A. "Yes, sir."

(To the admission of each and all of said questions the de-defendant at the time objected and excepted.

Other facts stated in opinion.

*L. F. Parker* and *B. R. Davidson,* for appellant.

Appellant's manner of lighting and opening doors and raisings the platforms in order to enable the trainmen to perform their services was not negligence. 106 N. Y. 136; 60 Am. R. 433; 12 Am. & Eng. R. Cas. 163. The court erred in the admission of evidence as to the condition and lighting of train three or four days subsequent. 58 Ark. 454; 6 Am. Neg. R. 199; 48 *Id.* Ev. § 52. It is only where a passenger is injured by the operation of a train or by a defective appliance that the presumption of negligence arises. 70 Ark. 481; 27 Am. & Eng. R. Cas. 132; 11 Atl. 815; 28 Atl. 140. No act of negligence alleged by the plaintiff was the proximate cause of the injury. 69 Ark. 402; 58 Am. & Eng. R. Cas. 448; 4 Am. Neg. Cas. 294. In walking upon this platform without any precaution and stepping into space without knowing where he was going, he was guilty of contributory negligence. 24 S. W. 563; 71 Ark. 590; 46 *Id.* 528; 18 Atl. 663; 60 Am. R. 433.

*J. V. Walker,* for appellee.

Appellee by walking into the vestibule of the car under the circumstances was not negligent, and assumed no risk by so doing. 95 Va. 187. Ordinarily a person would be guilty of contributory negligence for occupying a dangerous position in a car, but even this has its modifications. 108 U. S. 288; 20 S. W. 182; 39 Mo.

468; Elliott, Railroads vol. 4, § 1633. The negligence complained of applied to the platform of the car. There was no error in the admission of the testimony of appellee's son; for it all referred to the condition of things at the place where the injury occurred.

Wood, J. (after stating the facts.) It is the duty of railroads as common carriers of passengers to exercise ordinary care to provide their stations and cars with reasonable appointments for the safety and essential comfort of their passengers. *St. Louis, I. M. & S. Ry. Co.* v. *Wilson,* 70 Ark. 136, and authorities cited.

The particulars of alleged negligence to which the complaint directs inquiry are: "in not causing to be kept down in its place the trap door over the steps leading into the said car, and in not keeping closed the upright door for the entrance from the ground into said car by means of steps attached thereto, and in keeping said trap door open and said upright door open, and in failing to provide lights on or about the front platform of said car and steps."

All these allegations of negligence, in the opinion of the majority of the judges, are without evidence to sustain them. The uncontradicted proof that the trap doors to the vestibule coaches were raised in order to enable the brakeman to discharge their duties in the switching of the cars, and that it was customary to raise them in cities the size of Fort Scott should have elicited a verdict in its favor upon all the allegations of negligence except the failure to provide lights on or about the front platform of the car and steps. The proof showed that in cities the size of Fort Scott it was customary to lock the water closets to the coaches. That being true, it was absolutely essential to the comfort of the passengers that they should not be deprived of egress and ingress from and into the cars. The lifting of the trap doors and opening the upright doors to the vestibules, which are alleged as negligent acts, not only show the absence of any negligence, but the exercise of proper care for the safety and comfort of passengers. For otherwise the passengers, during the time the coach was detained for transfer, would be imprisoned with no opportunity to answer just such a call as appellee had in this case, or any other emergency that the necessities of the situation might demand. This, aside

from the requirements of the switching service, shows that these allegations of negligence were groundless.

The majority of the court are also of the opinion that the verdict should have been in favor of appellant upon the undisputed facts on the alleged negligence "in failing to provide lights on or about the front platform of the said car and steps."

The testimony of appellee himself, as bearing on this point, is as follows: The reason he came there to the door, he was hunting the water closet; thought he might have got to the wrong door when he tried the one that was locked, and as he come to the door and stopped and looked out, it was so dark that he could not see out there; the dark part is on the side the water closet was on, on the left side. He says on the other side near the depot there was a big light. "I guess it was an arc light, but it did not shine in there." Says when he came to the door he hammered on the door; thought perhaps the man was still out there. He knocked on the door, and did not hear anything, and he looked and did not see anything out there, and he took a step on the platform and fell to the ground. He was asked if he saw the lights shining in there between the top and the floor of the car on the steps on that side, and answered "No." He says he did not see any lights; just what little light that comes through the car door. He also said that he did not remember to have seen any light on the steps.

The testimony on behalf of appellant shows that the platform was well lighted by electric arc lights on both sides of the track on which the coach was standing when appellee was injured. The whole testimony, taken together, causes the majority to conclude that the appellant had exercised all the care that the law required to light its car platform, that under the circumstances the law did not require that the company have lights in the vestibule of the car. That the lights in the car and from the depot building, and especially the arc lights on both sides of the track on which the car was located, met every requirement of ordinary care to provide the passengers a reasonably safe exit and entrance upon the car, should they desire, for any reason, to debark therefrom while the car was in waiting.

The court is therefore of the opinion that the verdict is

contrary to the undisputed evidence, that the trial court erred in refusing appellant's first prayer for instruction declaring "that the proof has failed to show any act of negligence of the defendant company."

The court deems it unnecessary to discuss other questions. While voicing the opinion of the majority, I do not concur in the conclusion that the court erred in refusing the first prayer of appellant for instruction. I am of the opinion that the questions of negligence and contributory negligence, upon the whole, were for the jury.

I concur in the judgment of reversal, however, upon the ground that the court erred in admitting the testimony of Ola Larsen. It related to a subsequent trip, by appellee's son, necessarily under different circumstances, and was therefore clearly incompetent and prejudicial. I am also of the opinion that the court erred in its rulings in granting, refusing and modifying certain prayers for instructions. But my individual views upon these could serve no purpose.

Judge BATTLE concurs in the judgment of reversal for the reason that in his opinion the undisputed evidence shows that appellee was guilty of contributory negligence. He is of the opinion that the question of negligence was for the jury.

The judgment is reversed, and the cause is remanded for further proceedings.